United States District Court
Southern District of Texas
**ENTERED**
April 15, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| SHARON JEAN CAIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 6:21-CV-00005 |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | |
| | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION**

Plaintiff Sharon Jean Cain brought this action on February 6, 2020 seeking review of the Commissioner's final decision determining she was not disabled.  (Case No. 6:21-cv-5, D.E. 1).[1]  On January 18, 2022, Plaintiff filed a Motion for Summary Judgment and Brief in Support.  (D.E. 14 and D.E. 15).  On March 10, 2022, Defendant filed a Cross Motion for Summary Judgment with Brief in Support.  (D.E. 16 and D.E. 17).  For the reasons below, the undersigned **RECOMMENDS** Plaintiff's Motion for Summary Judgment be **DENIED**, the Commissioner's Motion for Summary Judgment be **GRANTED** and this case be **DISMISSED**.

---

[1]The case was reassigned to United States Judge Drew Tipton on January 25, 2021 and referred to the undersigned on January 28, 2021.  (Case No. 6:20-mc-3, D.E. 5 and D.E. 6).  Plaintiff's Application to Proceed *In Forma Pauperis* was granted on January 28, 2021, and this civil action was opened.  (D.E. 1).  After the Commissioner filed an answer on September 17, 2021, the undersigned entered a briefing schedule.  (D.E. 11).

## I.      JURISDICTION

The Court has jurisdiction over the subject matter and the parties pursuant to 42 U.S.C. § 405(g).  This case has been referred to the undersigned pursuant to 28 U.S.C. § 636.

## II.     STANDARD OF REVIEW

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards.  *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted); *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). The burden has been described as more than a scintilla but lower than a preponderance. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (citation omitted).  A finding of "no substantial evidence" occurs "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (citations omitted).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present.  However, the Court does not reweigh the evidence, try the issues de novo or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citations omitted); *Carey*, 230

F.3d at 135 ("Conflicts in the evidence are for the Commissioner to resolve.") (citation omitted).

In evaluating a disability claim, the Commissioner follows a five-step process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work. *Martinez v. Chater*, 64 F.3d 172, 173-174 (5th Cir. 1995) (citations omitted). The claimant bears the burden of proof on the first four steps with the burden shifting to the Commissioner at the fifth step who must show that, in light of claimant's residual functional capacity ("RFC"), claimant can perform other substantial work in the national economy. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

## III.   PROCEDURAL BACKGROUND

Plaintiff filed an application for benefits on August 23, 2016 at age 56, alleging disability as of April 2, 2008, due to COPD, asthma, PTSD, depression and insomnia. (D.E. 10-3, Page 12; D.E. 10-4, Pages 4 and 11; D.E. 10-6, Pages 4-5; D.E. 10-7, Page 5). She has a high school degree, cosmetology training and past work experience as a hair stylist. (D.E. 10-7, Page 6). After Plaintiff's applications were denied initially and upon reconsideration, at Plaintiff's request, a hearing was held before an administrative law judge ("ALJ") on April 8, 2019, at which Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified. (D.E. 10-3, Pages 29-51 and D.E. 10-5, Pages 6-9 and

14-19).  The ALJ issued an unfavorable decision on May 22, 2019, finding Plaintiff not disabled through the date of the decision.  (D.E. 10-3, Pages 12-24).

The Appeals Council declined Plaintiff's request for review on December 9, 2019, making the ALJ's decision final.  (D.E. 10-3, Pages 2-6).  Plaintiff then filed this action on February 6, 2020, seeking review of the Commissioner's final decision.  (Case No. 6:20-mc-3, D.E. 1).

## IV.   ISSUES PRESENTED

Plaintiff challenges the ALJ's mental and physical RFC determinations. Specifically, Plaintiff asserts (1) the ALJ failed to properly consider the opinion of consultative examiner Dr. Corinne Alvarez-Sanders, Ph.D.[2] when determining Plaintiff's mental RFC and (2) the physical RFC is not supported by substantial evidence because the ALJ failed to adequately develop the record.

## V.   SUMMARY OF THE RECORD[3]

On May 21, 2013, Plaintiff was treated at Tejas Health Care for thyroid problems and was noted as presenting with an appropriate but depressed mood and affect, difficulty concentrating, diminished interest or pleasure, loss of appetite and restlessness.  (D.E. 10-10, Pages 3 and 5).  Plaintiff stated she did not have any chronic pain but did have back and joint pain.  (D.E. 10-10, Pages 3-4).  Plaintiff's overall appearance was normal and she

---

[2]While Plaintiff initially asserts the ALJ failed to properly evaluate the opinion of consultative examiner Bernardo Flores, Psy.D., it is clear this is an inadvertent error as there are no treatment records from this examiner and Plaintiff later identifies Dr. Alvarez-Sanders.  (D.E. 15, Pages 2, 7 and 10-15).

[3]The undersigned has thoroughly reviewed the entire record even though all records are not detailed in this summary.

was noted to have a normal memory and to be oriented to time, place, person and situation. (D.E. 10-10, Page 5).  Plaintiff was found to have uncontrolled diabetes, acute depression and chronic migraines.  (D.E. 10-10, Page 6).

Plaintiff was again treated at Tejas Health Care on June 18, 2013.  (D.E. 10-10, Page 7).  Plaintiff reported she felt less fatigued after her thyroid medication was adjusted and also reported recurrent right buttock and hip pain.  (D.E. 10-10, Page 7).  Plaintiff is noted as having an overall normal appearance, having a normal gait, normal memory, being oriented to time, place, person and situation and having an appropriate mood and affect. (D.E. 10-10, Page 9).  Plaintiff was assessed as having hypothyroidism and limb pain. (D.E. 10-10, Page 9).   In addition to thyroid and depression medication, Plaintiff was prescribed ibuprofen and aspirin.  (D.E. 10-10, Page 10).

Plaintiff was again treated at Tejas Health Care on July 19, 2013 for thyroid problems and headaches.  (D.E. 10-10, Page 11).  Plaintiff reported fatigue, nervousness, chronic headaches and right neck pain.  (D.E. 10-10, Page 11).  Plaintiff's memory is noted as normal and she was oriented to time, place, person and situation.  (D.E. 10-10, Page 13). Her medications were continued and a muscle relaxant was added.  (D.E. 10-10, Pages 13-14).

On September 6, 2013, Plaintiff was treated at Tejas Health Care for right arm and breast pain.  (D.E. 10-10, Page 15).  Plaintiff was noted as oriented to time, place person and situation and her overall appearance was normal.  (D.E. 10-10, Page 17).  Plaintiff's

pain was noted as being "fair[ly] control[led]," her medications were continued and she was advised to avoid strenuous activity.  (D.E. 10-10, Page 17).

Plaintiff was again treated at Tejas Health Care on October 9, 2013 for elbow and knee pain.  (D.E. 10-10, Page 19).  Plaintiff reported her right elbow pain started two months prior after she hit it and that it was "getting better."  (D.E. 10-10, Page 19).  Plaintiff also reported her right knee intermittently hurt, there was no swelling or injury and she treated it with ibuprofen.  (D.E. 10-10, Page 19).  Plaintiff's appearance, balance, gait and motor skills were normal and she was noted as awake and alert with mild distress as well as being oriented to time, place, person and situation.  (D.E. 10-10, Page 20).  Plaintiff's medications were continued.  (D.E. 10-10, Page 21).

On January 2, 2014, Plaintiff was treated at Tejas Health Care for left foot and neck pain.  (D.E. 10-10, Page 22).  Plaintiff was noted as having depression and a headache. (D.E. 10-10, Page 24).  Her gait was abnormal and while she was oriented to time, place, person and situation with the appropriate mood and affect and normal memory, she also reported being anxious, having mood swings, hallucinations, feelings of hopelessness, paranoia and suicidal ideation.  (D.E. 10-10, Page 25).  Plaintiff's medications were continued and she was advised to schedule appointments with a neurologist and a podiatrist.  (D.E. 10-10, Page 26).

Plaintiff was treated at Citizens Medical Center on January 4, 2014 for sudden chest pain. (D.E. 10-12, Pages 11-22).  A chest x-ray found "[n]o acute findings in the chest" with clear lungs, a normal size heart and no pleural effusion or pneumothorax.  (D.E. 10-

12, Page 16).  Stress testing was also normal, noted as an "[u]nremarkable myocardial perfusion study." (D.E. 10-12, Page 17).  Plaintiff was noted as being oriented, having a normal mood and affect and having full range of motion in her extremities.  (D.E. 10-12, Page 22).

On January 13, 2014, Plaintiff was treated at Bastrop Foot and Ankle for pain in her left foot during the previous six months.  (D.E. 10-9, Page 20).  Plaintiff was noted as alert, oriented, attentive, cooperative and well groomed.  (D.E. 10-9, Page 20).  Plaintiff was also noted as having no back or neck pain and being able to "ascend, descend stairs with ease." (D.E. 10-9, Page 20).  Her muscle strength and alignment in her lower extremities were noted as normal as was the range of motion for all joints.  (D.E. 10-9, Page 20).  Plaintiff was further noted as walking heal and toe with ease as well as arising from a seated position unassisted.  (D.E. 10-9, Page 20).  Plaintiff was found to have a bunion deformity and surgery was recommended.  (D.E. 10-9, Pages 20-21).  On February 24, 2014, Plaintiff was again noted as alert, oriented, attentive, cooperative and well groomed with no back or neck pain and full range of motion in all joints.  (D.E. 10-9, Page 31).  She was scheduled for foot surgery.  (D.E. 10-9, Page 33).  On March 20, 2014, Plaintiff was treated after her surgery, the surgical site was normal post-op with no pain or tenderness reported and Plaintiff was noted as not compliant with instructions and ambulating with a surgical shoe. (D.E. 10-9, Page 33).  At her one week follow up appointment on March 27, 2014, Plaintiff again denied any pain or tenderness and was again noted as non-compliant with post-op instructions.  (D.E. 10-9, Page 34).  However, the surgical site was noted as normal and

doing well.  (D.E. 10-9, Page 34).  These were the same findings at Plaintiff's March 31, 2014 follow up appointment and she was encouraged to remain in closed shoes to tolerance. (D.E. 10-9, Page 35).  On April 14, 2014, Plaintiff was again noted as doing well and she was advised she could return to all activities.  (D.E. 10-9, Page 36).

On May 29, 2014, Plaintiff was treated at Tejas Health Care for treatment for depression.  (D.E. 10-10, Page 27).  Plaintiff stated she could fall asleep sitting up, did not sleep well at night and wanted to stop taking Paxil for treatment of her depression because of these side effects.  (D.E. 10-10, Page 27).  Plaintiff was noted as fatigued, having changes in appetite, having difficulty concentrating and a depressed mood.  (D.E. 10-10, Page 29).  Her overall appearance was noted as normal, she was oriented to time, place, person and situation with the appropriate mood and affect and her coordination and motors skills were normal.  (D.E. 10-10, Page 29).  Plaintiff was advised to continue taking Paxil in the morning and her thyroid medication in the evening and to stay awake during the day and sleep only at night.  (D.E. 10-10, Page 30).  Plaintiff's hypothyroidism was noted as controlled.  (D.E. 10-10, Page 30).

Plaintiff was again treated at Tejas Health Care on July 1, 2014 for sudden mild to moderate pain in her lower back.  (D.E. 10-10, Page 31).  Plaintiff stated she was moving heavy equipment and felt a "pull" in her lower right lumbar area.  (D.E. 10-10, Page 31). Plaintiff was noted as having a depressed mood with an overall normal appearance, being oriented to time, place, person and situation and having poor insight.  (D.E. 10-10, Pages 33-34).  Plaintiff was advised to put heat on her back and take her current medications,

including a muscle relaxer and ibuprofen, as directed.  (DE. 10-10, Page 34).  The same day, Plaintiff received a consultation for depression by a licensed professional counselor at Tejas Health Care.  (D.E. 10-10, Page 36).  Plaintiff's depression symptoms, including depressed mood, difficulty concentrating, difficulty falling and staying asleep and fatigue were noted to occur intermittently and to be "fairly controlled" by Paxil.  (D.E. 10-10, Page 36).  Plaintiff denied having any chronic pain, headaches or nausea.  (D.E. 10-10, Page 36).  Plaintiff reported she was raising her granddaughter, who lived with her, as did her common-law husband and mother.  (D.E. 10-10, Pages 36-37).  Plaintiff was noted to be oriented to person, place, time and situation with appropriate speech and mood with an average intellect, cooperative attitude, maintained attention, fair impulse control, and fair judgment, insight and logical thought processes and having no suicidal ideations.  (D.E. 10-10, Page 38).  Plaintiff was advised to start counseling in addition to taking Paxil.  (D.E. 10-10, Pages 36 and 38-39).

Plaintiff received individual mental health counseling on July 7, 2014 at Tejas Health Care.  (D.E. 10-10, Page 40).  Plaintiff continued to report fatigue as well as difficulty with family relationships.  (D.E. 10-10, Pages 40-41).  Plaintiff was noted as having appropriate appearance, a euthymic mood, being oriented to time, person, place and situation, appropriate affect, intact memory, a cooperative attitude, maintained attention, average intellect, logical thought processes, no suicidal ideations and fair impulse control, judgment, insight and reasoning.  (D.E. 10-10, Page 41).

Plaintiff again received individual mental health counseling on July 14, 2014 at Tejas Health Care.  (D.E. 10-10, Page 43).  Plaintiff reported she was "doing okay" but was still frequently tired.  (D.E. 10-10, Pages 43-44).  Plaintiff reported she saw her deceased grandmother in the room who was there to comfort her and it was noted that "by observation this did not appear to be a visual hallucination but rather part of her belief system."  (D.E. 10-10, Page 44).  Plaintiff was noted to have an appropriate appearance, being oriented to time, person, place and situation, appropriate speech and affect, a euthymic mood, intact memory, average intellect, cooperative attitude, maintained attention, fair reasoning and impulse control, poor judgment and insight, logical thought processes and no suicidal ideations.  (D.E. 10-10, Page 44).  During her health care appointment the same day at Tejas Health Care, Plaintiff reported intermittent fatigue and that she fell asleep when driving.  (D.E. 10-10, Page 46).  Plaintiff was noted to be anxious with normal memory, being oriented to time, person, place and situation and having poor judgment.  (D.E. 10-10, Page 48).  Her medications were continued.  (D.E. 10-10, Page 49).

On August 2, 2014, Plaintiff was treated at Lavaca Medical Center for chest pain after she lifted a heavy treadmill earlier that day.  (D.E. 10-8, Pages 3 and 5).  She was noted as being in no acute distress, having a normal range of motion in her neck, being alert and oriented to time, person and place with a depressed mood, having no sign of tenderness or trauma in her back, hips or extremities with a normal range of motion in all.

(D.E. 10-8, Pages 4-5).  Plaintiff was prescribed an anti-inflammatory and pain medication for a rib separation.  (D.E. 10-8, Pages 4 and 6).

Plaintiff again received individual mental health counseling on August 14, 2014 at Tejas Health Care.  (D.E. 10-10, Page 50).  Plaintiff reported she was not doing well because her fiancé said she should not be coming to counseling and they were having communication problems.  (D.E. 10-10, Page 50).  Plaintiff stated she recently reached out to an old friend and she wanted to increase her social contacts.  (D.E. 10-10, Page 50). Plaintiff's appearance, speech and affect are noted as appropriate; she was oriented to time, person, place and situation; her mood was euthymic and her memory was intact; her intellect was average; she had a cooperative attitude with maintained attention and fair reasoning; her impulse control, judgment and insight were fair with logical thought processes and she had no suicidal ideations.  (D.E. 10-10, Page 51).

On August 21, 2014, Plaintiff was treated at Tejas Health Care for increased urinary urgency.  (D.E. 10-10, Page 53).  Plaintiff reported fatigue and a depressed mood with difficulty initiating sleep and concentrating.  (D.E. 10-10, Page 54).  Plaintiff was noted as having a normal overall appearance and normal level of distress with appropriate mood and affect, being oriented to time, place, person and situation and having poor insight and judgment.  (D.E. 10-10, Page 55).  Plaintiff was prescribed antibiotics for a urinary tract infection.  (D.E. 10-10, Page 55).

Plaintiff again received individual counseling at Tejas Health Care on September 2, 2014.  (D.E. 10-10, Page 57).  Plaintiff reported "she was doing pretty well and had been

feeling a lot more energy lately" even after reducing her antidepressant medication. (D.E. 10-10, Page 57). Plaintiff reported her relationship with her mother and her fiancé were improving. (D.E. 10-10, Page 57). Plaintiff's appearance was noted as normal; she was oriented to time, place, person and situation; her speech and affect were appropriate; her mood was euthymic; her memory was intact; her intellect was average; her attitude was cooperative and her attention maintained with good reasoning, impulse control, judgment and insight; her thought processes were logical and she had no suicidal ideations. (D.E. 10-10, Page 58). Plaintiff was also treated for a UTI the same day and she reported her "fatigue is better with vitamins and exercise." (D.E. 10-10, Page 60).

On September 15, 16, 19 and 22, 2014, Plaintiff was treated at Tejas Health Care for poison ivy. (D.E. 10-11, Pages 5, 17 and 22). Plaintiff was noted as being in mild distress with normal memory, being oriented to time, place, person and situation and having an appropriate mood and affect with normal insight and judgment. (D.E. 10-11, Pages 8, 19 and 29). She was further noted to have no joint swelling or muscle weakness. (D.E. 10-11, Page 28). Plaintiff was given a topical cream, antibiotics, steroids and an injection for treatment of contact dermatitis. (D.E. 10-11, Pages 8, 20, 27 and 29). On September 16, 2014, Plaintiff also attended another counseling session and Plaintiff reported she had been doing well but needed to increase the dose of her antidepressant and her relationships with her fiancé and mother were again strained. (D.E. 10-11, Pages 10-11).

Approximately four months later, Plaintiff was again treated at Tejas Health Care on January 16, 2015 for depression.  (D.E. 10-11, Page 38).  It is noted that her rash was "finally resolved."  (D.E. 10-11, Page 38).  Plaintiff reported her antidepressant medication caused headaches and did not help treat her depression.  (D.E. 10-11, Page 38).  She further reported her relationship with her husband was strained because she found out the previous week he was having an affair.  (D.E. 10-11, Page 38).  Plaintiff also reported she was falling asleep while driving so she no longer drove, she took short naps and did not sleep well.  (D.E. 10-11, Page 38).  Plaintiff was noted to be depressed but being oriented to time, place, person and situation with appropriate behavior, having no anxiety or acute distress and normal language, insight, judgment, attention span and concentration.  (D.E. 10-11, Page 41).  Her antidepressant medication was decreased and a sleep study and thyroid tests were ordered.  (D.E. 10-11, Page 41).

Approximately seven months later, on August 7, 2015, Plaintiff was treated at Lavaca Medical Center reporting intermittent, moderate headaches occurring for the past six weeks.  (D.E. 10-8, Pages 10 and 12).  Plaintiff was noted as being in moderate to severe distress, having a normal range of motion in her neck, back and extremities and being alert and oriented to time, person and place as well as being cooperative, interactive and responding appropriately.  (D.E. 10-8, Pages 10-13).  A CT the same day showed "[n]o acute intracranial CT findings."  (D.E. 10-8, Page 14).  Plaintiff was prescribed Tylenol and Motrin and advised to follow up with her physician as needed and an ophthalmologist as soon as possible.  (D.E. 10-8, Page 15).

Just over three months later, on November 18, 2015, Plaintiff was treated at Bastrop Regional Foot and Ankle for an injury to her left foot after she kicked a bed frame.  (D.E. 10-9, Page 24).   Plaintiff also wanted to discuss foot surgery.  (D.E. 10-9, Page 24). Plaintiff was noted as alert, oriented, attentive, cooperative and well groomed.  (D.E. 10-9, Page 24).  She was further noted as being able to perform fine motor skills, to dress herself, being able to ascend and descend stairs with ease, having no back or neck pain, no insomnia, no muscle aches and no fatigue.  (D.E. 10-9, Page 24).  Plaintiff's left toes were noted as bruised, not fractured, and surgery was scheduled for treatment of a bone spur. (D.E. 10-9, Pages 24-25).

On December 7, 2015, Plaintiff was again treated at Bastrop Regional Foot and Ankle for a pre-operative assessment prior to her December 11, 2015 surgery for a bone spur on her left foot.  (D.E. 10-9, Page 29).  Plaintiff was noted as alert, oriented, attentive, cooperative, well groomed, having no back or neck pain, no fatigue or insomnia, being able to ascend and descend stairs with ease and being able to walk heel to toe with ease as well as arise from a seated position unassisted.  (D.E. 10-9, Page 29).  On December 17, 2015, Plaintiff was treated at Bastrop Regional Foot and Ankle after her surgery.  (D.E. 10-9, Page 26).  Plaintiff denied any pain or tenderness and the surgical sites were normal post-surgery.  (D.E. 10-9, Page 26).  Plaintiff was noted as doing well and ambulating in a surgical shoe/boot.  (D.E. 10-9, Page 26).  Plaintiff was scheduled for a one week follow up appointment.  (D.E. 10-9, Page 26).  On December 30, 2015, Plaintiff again denied any

pain or tenderness and Plaintiff was again noted as doing well.  (D.E. 10-9, Page 27).
Plaintiff was scheduled for a three week follow up appointment.  (D.E. 10-9, Page 27).

Plaintiff was treated at Lavaca Medical Center on January 12, 2016 for right hip and right thigh pain.  (D.E. 10-8, Page 17).  Plaintiff reported she was exiting a car and twisted her leg.  (D.E. 10-8, Page 17).  Plaintiff was noted as being in no acute distress but anxious; having a normal range of motion in her feet, ankles, legs and knees; having a limited right hip range of motion due to muscle pain as well as tenderness; having a gait limited by pain and being alert and oriented to person, place, time and situation.  (D.E. 10-8, Pages 17 and 19).  Plaintiff was noted as having a right thigh muscle strain in her quadriceps and hamstring.  (D.E. 10-8, Page 18).  Radiology reports examining Plaintiff's right femur and right hip showed mild degenerative changes with "[n]o other significant bone or joint abnormality" and normal soft tissue.  (D.E. 10-8, Page 21).  The overall impression was osteoarthritis.  (D.E. 10-8, Pages 21 and 22).  Plaintiff was prescribed anti-inflammatory and pain medication and was advised to follow up with her physician.  (D.E. 10-8, Pages 20 and 23).

On January 27, 2016, Plaintiff was again treated at Bastrop Regional Foot and Ankle after her foot surgery.  (D.E. 10-9, Page 22).  Plaintiff denied any pain or tenderness and it was noted that she was doing well.  (D.E. 10-9, Page 22).  Plaintiff was "encouraged to remain in closed shoes to tolerance" and to schedule a follow up in three months.  (D.E. 10-9, Page 22).

Plaintiff was treated at the Victoria Vein and Surgery Clinic on December 9, 2015 and February 5, March 23 and 25, April 11 and May 11, 18, 20 and 31, 2016 for treatment of varicose veins.  (D.E. 10-19, Pages 6, 9, 13, 16, 19, 21, 27, 30 and 33).   At all appointments, Plaintiff reported having no breathing problems; no chest pain, muscle aches or joint pain; no decreased mobility; no headaches and no back pain; no anxiety, depression, psychiatric conditions or memory loss.  (D.E. 10-19, Pages 7-35).   She was consistently noted to be well developed and in no acute distress with a full range of motion in her extremities and neck.  (D.E. 10-19, Pages 7, 10, 14, 16, 19, 22, 28, 31 and 35-36). Plaintiff was further noted as alert, oriented, cooperative with exam and having good judgment and insight.  (D.E. 10-19, Pages 7, 10, 14, 17, 20, 22, 28-29, 31-32 and 35-36).

An April 13, 2016 carotid doppler ultrasound was normal show no significant plaque in Plaintiff's carotid arteries.  (D.E. 10-8, Page 24).  A May 13, 2016 radiology report related to Plaintiff' chest showed no acute disease.  (D.E. 10-8, Page 25).  Plaintiff's lungs were clear with no effusion, normal heart size and normal pulmonary vasculature. (D.E. 10-8, Page 25).

Plaintiff was treated at Citizens Medical Center on May 19, 2016 for a cough.  (D.E. 10-12, Pages 5-10).  Spirometry, vital capacity, lung volume and diffusion testing were conducted and findings were normal.  (D.E. 10-12, Pages 7 and 10).  Plaintiff was again treated at Citizens Medical Center on June 7, 2016 for a cough.  (D.E. 10-12, Page 3).  A chest x-ray showed "[n]o acute findings in the chest" with clear lungs and a normal size heart without pleural effusion or pneumothorax.  (D.E. 10-12, Page 4).

On June 23, 2016, Plaintiff was again treated at Lavaca Medical Center reporting back pain.  (D.E. 10-8, Page 26).  Plaintiff reported her initial injury to her cervical spine was the result of a car accident in 2009, having had therapy in the past from a chiropractor.  (D.E. 10-8, Page 26).  Plaintiff was advised to complete a home therapeutic exercise program, including moist heat and electrical stimulation.  (D.E. 10-8, Page 26).

On August 13, 2016, Plaintiff was again treated at Lavaca Medical Center reporting she could not breathe.  (D.E. 10-8, Page 27).  Plaintiff was noted as alert and in mild distress.  (D.E. 10-8, Page 28).  She was further noted as having a normal range of motion in her back, neck and extremities and being oriented to time, person, place and situation with a normal mood and affect.  (D.E. 10-8, Pages 28 and 31).  An EKG was normal.  (D.E. 10-8, Page 30).  A chest x-ray showed no acute disease with no infiltrates or effusions.  (D.E. 10-8, Page 35).  Plaintiff was found to have bronchitis and COPD.  (D.E. 10-8, Page 29).

Plaintiff filed an application for benefits on August 23, 2016 at age 56, alleging disability as of April 2, 2008, due to COPD, asthma, PTSD, depression and insomnia.  (D.E. 10-3, Page 12; D.E. 10-4, Pages 4 and 11; D.E. 10-6, Pages 4-5; D.E. 10-7, Page 5)).

The next day, on August 24, 2016, Plaintiff was treated at Lavaca Family Health Clinic for a chronic cough and trouble breathing.  (D.E. 10-13, Page 22).  Plaintiff was again found to have bronchitis.  (D.E. 10-13, Page 23).  Plaintiff was noted as having a normal mood and affect and being oriented to time, place and person.  (D.E. 10-13, Page 23).

On September 8, 2016, Plaintiff was treated at Lavaca Medical Center reporting right elbow, left knee and buttock pain after slipping on a puppy pee pad on the floor. (D.E. 10-8, Pages 39 and 43). Plaintiff was noted as in no acute distress; alert; being oriented to person, place, time and situation with normal mood and affect and no back or hip pain or tenderness. (D.E. 10-8, Pages 39-44). X-rays of Plaintiff's left knee were unremarkable, showing no significant bone or joint abnormality, normal soft tissues and well-preserved joint spaces. (D.E. 10-8, Page 47). Plaintiff was prescribed Tylenol and crutches. (D.E. 10-8, Page 46).

Plaintiff was treated at Lavaca Family Health Clinic on October 7, 2016, requesting to have her thyroid medication increased. (D.E. 10-13, Page 19). Plaintiff was noted as having depression, COPD and a chronic cough. (D.E. 10-13, Page 19). Plaintiff was also noted as having very poor understanding of respiratory treatment and being mentally slow. (D.E. 10-13, Page 20).

Over two months later, Plaintiff completed a Function Report on December 22, 2016. (D.E. 10-7, Pages 13-20 and 30-37). Plaintiff reported she could walk, drive and ride in a car. (D.E. 10-7, Page 16). Plaintiff also reported she took care of her minor granddaughter who lived with her. (D.E. 10-7, Page 31). Plaintiff further reported she cared for animals with her granddaughter's assistance. (D.E. 10-7, Page 31). Plaintiff reported she shopped for three or four hours at a time. (D.E. 10-7, Page 16). She also reported she could pay bills, handle a savings account and use a checkbook. (D.E. 10-7, Page 16). Plaintiff stated her hobbies were playing with her granddaughter, hunting,

fishing, sewing, watching television with her granddaughter, bowhunting and visiting friends and family.  (D.E. 10-7, Page 17).  She reported spending time with others, specifically going to the store with her mother one or two times a week.  (D.E. 10-7, Page 17).  She reported she could lift 50 pounds and could walk for a few hours before she needed a three to five minute break but that it hurt to bend, squat or climb stairs.  (D.E. 10-7, Page 18).  Plaintiff also stated she got along well with authority figures but could not handle stress or changes in routine.  (D.E. 10-7, Page 19).  Plaintiff reported she made her own meals daily.  (D.E. 10-7, Page 32).  She also reported she performed household chores, including sweeping, laundry, ironing and mowing the yard.  (D.E. 10-7, Page 32).

On December 27, 2016, Plaintiff's application was initially denied.  (D.E. 10-4, Page 8).

Approximately three months later, on April 20, 2017, Plaintiff was again treated at Lavaca Medical Center for upper neck and back pain.  (D.E. 10-8, Page 50 and D.E. 10-13, Page 16).  Imaging of Plaintiff's lumbar and cervical back were normal, with normal disc spaces, vertebral heights and alignment.  (D.E. 10-8, Pages 53-54).  Plaintiff was noted to be oriented to person, place and time with normal motor skills, reflexes and an anxious mood.  (D.E. 10-13, Page 17).  Plaintiff was advised to lose weight and was again prescribed ibuprofen.  (D.E. 10-13, Page 17).

Plaintiff was again treated at Lavaca Family Health Clinic on May 2, 2017 for upper neck and back pain.  (D.E. 10-13, Page 14).  Plaintiff was noted as alert and in moderate distress.  (D.E. 10-13, Page 14).  She was also noted to be oriented to time, place and person

with normal motor skills and reflexes.  (D.E. 10-13, Page 15).  Plaintiff was prescribed a TENS unit.[4]  (D.E. 10-13, Page 15).

Dr. Corinne T. Alvarez-Sanders, Ph.D., performed a mental consultative examination on May 18, 2017.  (D.E. 10-8, Pages 57-62).  Plaintiff was noted as casually dressed and well groomed with "[r]apport…easily established" and Plaintiff was also noted as "responsive and cooperative throughout the examination."  (D.E. 10-8, Pages 57 and 59).  Plaintiff was further noted as a "reliable historian" with clear speech, normal in speed, tone and volume, and maintaining eye contact while providing "concise and detailed responses to requests for information."  (D.E. 10-8, Pages 57 and 59).  Her responses are also noted as "organized and goal directed" with "no indications of loosening of associations, tangential thought processes or circumstan[ces]."  (D.E. 10-8, Page 59).  Plaintiff reported she lived with her mother, son and her son's girlfriend as well as her eight year old granddaughter of whom she had joint custody.  (D.E. 10-8, Page 58).  Plaintiff further reported she did laundry, drove, shopped, wrote poems and songs, sat outside and listened to music and performed her own personal daily hygiene.  (D.E. 10-8, Page 58).  Plaintiff also reported she had a good appetite, did not have friends, felt comfortable around a few people but was anxious in crowds, did not have conflicts with people and preferred to stay home.  (D.E. 10-8, Page 58).  Plaintiff was noted as having "never experienced an episode of decompensation…[or being] hospitalized for a mental health condition."  (D.E. 10-8, Page 58).  Cognitive testing revealed below average functioning.  (D.E. 10-8, Page

---

[4] A TENS unit is a muscle stimulator.

59).  Plaintiff reported having occasional suicidal ideations but she did not have an imminent plan to commit suicide and had never attempted suicide.  (D.E. 10-8, Page 59).  Plaintiff further reported feeling like people "are watching her and thinking they are better than her" and that she "can see and talk to the spirits of" her deceased relatives.  (D.E. 10-8, Page 59).  She reported her deceased "brother sometimes appears as a dove" and her "deceased grandson appears as a redbird."  (D.E. 10-8, Pages 59-60).  Plaintiff further reported she visited the cemetery often.  (D.E. 10-8, Page 60).  Plaintiff's mood and affect were noted as depressed throughout the examination and "[h]er intelligence appeared to be average."  (D.E. 10-8, Page 60).  It was also noted that her auditory memory was below average as she repeated only two of three orally delivered words immediately after oral presentation but she repeated all three words during a second trial.  (D.E. 10-8, Page 60).  Her remote memory, concentration, judgment and insight were found to be average and Plaintiff was able to follow simple oral and written directions.  (D.E. 10-8, Page 60).  Dr. Alvarez-Sanders opined Plaintiff had a major depressive disorder with anxious distress and mood-congruent psychotic features as well as PTSD related to sexual abuse as a child and a sexual assault as an adult.  (D.E. 10-8, Page 61).  She further opined the following as to Plaintiff's functional capability:

> Ms. Cain is capable of following simple oral directions and following multiple step directions.  She has average judgment and insight.  Her memory for retaining simple oral information is below average.  Her concentration is average.  Her processing speed of information appears to be average.  Her intelligence appears to be average.  She has poor social communication skills and she avoids contact with people due to social anxiety and panic attacks.  Her depression and anxiety significantly interfere with her ability to

consistently complete tasks.  She is likely to encounter significant difficulty dealing with everyday pressures and stress in a work environment.

D.E. 10-8, Page 61).

State agency medical consultant, Dr. Richard J. Hamersma, Ph.D., opined on June 6, 2017 that Plaintiff was bipolar, had anxiety and an obsessive-compulsive disorder.  (D.E. 10-4, Page 17).  He opined Plaintiff did have a "significant mental impairment" and as a result, her ability to understand, remember or apply information and her ability to adapt or manage herself was mildly limited and her ability to interact with others and to concentrate and maintain pace was moderately limited.  (D.E. 10-4, Pages 17-19).  Dr. Hamersma assessed a mental RFC as follows:  Plaintiff could remember locations and work-like procedures; could understand, remember and carry out very short and simple instructions; was moderately limited in her ability to understand, remember and carry out detailed instructions, having average judgment and insight and below average memory; was moderately limited in her ability to maintain attention and concentration for extended periods as well as in her ability to work in coordination with others without being distracted by them; was moderately limited in her ability to make simple work-related decisions and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; was moderately limited in her ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers and peers; could ask simple questions or request assistance and could maintain socially appropriate behavior and adhere to basic

standards of neatness and cleanliness; was moderately limited in her ability to respond appropriately to changes in the work setting; and could travel in unfamiliar places and use public transportations taking appropriate precautions of normal hazards. (D.E. 10-4, Pages 20-22). He further noted Plaintiff could "adapt to routine changes in a work setting." (D.E. 10-4, Page 22).

Also on June 6, 2017, Plaintiff was treated at Lavaca Family Health Clinic for a rash. (D.E. 10-13, Page 12). Plaintiff was noted to be oriented to person, place and time and to have a normal mood and affect. (D.E. 10-13, Page 13). Plaintiff was prescribed medication to treat the rash. (D.E. 10-13, Page 13).

On June 7, 2017, Plaintiff's application was denied upon reconsideration. (D.E. 10-4, Page 24).

Plaintiff was treated at Lavaca Family Health Clinic on June 13, 2017, reporting right chest pain when taking a deep breath after being hugged very hard. (D.E. 10-13, Page 10). Plaintiff was noted as being oriented to time, place and person with a normal mood and affect. (D.E. 10-13, Page 11). Imaging of Plaintiff's right-side ribs was "[u]nremarkable" with "[n]o obvious rib fracture seen" and normal soft tissues. (D.E. 10-13, Page 57). Plaintiff was advised to take Advil and to schedule a follow up appointment if the pain persisted. (D.E. 10-13, Pages 11 and 57).

A month later, on July 13, 2017, Plaintiff was treated at Lavaca Family Health Clinic for depression. (D.E. 10-13, Page 44). Plaintiff's neck was normal, she had normal breath sounds and was in no respiratory distress. (D.E. 10-13, Page 44). She was also oriented

to time, person and place with normal reflexes and a depressed mood.  (D.E. 10-13, Page 45).   Plaintiff's medication were adjusted and continued.  (D.E. 10-13, Page 45).

On July 27, 2017, Plaintiff was treated at Lavaca Family Health Clinic for right side chest pain.  (D.E. 10-13, Page 42).  Plaintiff was noted as alert, having a normal mood and affect and being oriented to time, place and person.  (D.E. 10-13, Pages 42-43).  Plaintiff had no respiratory distress, normal breath sounds and normal heart sounds.  (D.E. 10-13, Page 43).  Plaintiff was again prescribed ibuprofen which she was to take regularly and told to follow-up.  (D.E. 10-13, Page 43).

Over five months later, on December 28, 2017, Plaintiff was treated for a headache at Lavaca Family Health Clinic.  (D.E. 10-13, Page 40).  Plaintiff was noted as being alert, in mild distress, being oriented to time, person and place and having a normal mood and affect.  (D.E. 10-13, Pages 40-41).  Her neck was noted as normal and she was not in respiratory distress and had normal breath sounds.   (D.E. 10-13, Page 41).  Plaintiff was again prescribed medication.  (D.E. 10-13, Page 41).

On January 18, 2018, Plaintiff was treated at Lavaca Family Health Clinic for the flu.  (D.E. 10-13, Page 36).  Plaintiff was noted as having no respiratory distress, normal breath sounds, a normal neck and being oriented to time, person and place with a normal mood and affect.  (D.E. 10-13, Pages 37-38).  Responses to a depression questionnaire showed moderate depression symptoms.  (D.E. 10-13, Pages 38-39).

On February 20, 2018, Plaintiff was treated at Lavaca Family Health Clinic for right foot pain after she kicked a water bottle while barefoot several months prior.  (D.E. 10-13,

Page 34).  Plaintiff was noted as having a normal mood and affect and a normal range of motion in her neck and back.  (D.E. 10-13, Page 35).  Plaintiff was also noted as being in no respiratory distress with normal breath sounds.  (D.E. 10-13, Page 35).  Imaging of Plaintiff's right foot showed no fracture or other abnormality.  (D.E. 10-13, Page 50).  Plaintiff was referred to a podiatrist.  (D.E. 10-13, Page 35).

Approximately eight months later, Plaintiff received physical therapy from Lavaca Medical Center on October 16, 2018 for back and neck pain.  (D.E. 10-16, Pages 6-7).  Plaintiff reported a history of headaches and neck pain and that her headaches and migraines were becoming more frequent and intense.  (D.E. 10-16, Page 7).  Plaintiff also reported her neck pain, with an onset over the last few months, made it difficult to rotate her head to the right.  (D.E. 10-16, Page 7).  Plaintiff reported she no longer worked, was unable to take part in her normal recreational activities, such as bowling, hunting and golfing and took "ibuprofen occasionally for pain."  (D.E. 10-16, Page 7).  Plaintiff's rehabilitation potential was noted as good and she was approved for six weeks of physical therapy sessions, three times per week.  (D.E. 10-16, Pages 8 and 33 and D.E. 10-17, Page 63).

On October 25, 29 and 31, 2018, Plaintiff received physical therapy at Lavaca Medical Center, reporting soreness and neck pain, pain relief after therapy sessions and that she "like[d] the manual therapy better than the exercises."  (D.E. 10-16, Pages 37, 39 and 42).  Plaintiff again received physical therapy on November 2, 2018, reporting she felt

better with neck pain at seven out of ten.  (D.E. 10-16, Page 35).  Plaintiff also reported her

neck was moving better after massage therapy.  (D.E. 10-16, Page 35).

On November 5, 2018, Plaintiff was sent a letter from the Lavaca Medical Center

Outpatient Clinic asking whether Plaintiff would attend her counselor and/or psychiatry

appointment as they had been unable to contact her via telephone.  (D.E. 10-15, Page 51).

The same day, Plaintiff received physical therapy, reporting she was having a sinus

headache and did not want to do much physical therapy today.  (D.E. 10-16, Page 32).  She

was noted as having an "improved cervical ROM" and less pain following manual therapy.

(D.E. 10-16, Page 32).  Plaintiff was further noted as having declined to do band exercises

"stating she needed to get to work."  (D.E. 10-16, Page 32).

On November 7, 2018, Plaintiff again received physical therapy again at Lavaca

Medical Center, reporting no pain upon arrival because she used essential oils on her neck

and shoulder.   (D.E. 10-16, Page 30).   Plaintiff again received physical therapy on

November 8, 2018, reporting "feeling 'a lot better' after soft tissue massage at the end of

treatment."  (D.E. 10-16, Page 28).  On November 12, 2018, Plaintiff received physical

therapy, reporting a panic attack the previous day while taking a trip to Houston.  (D.E. 10-

16, Page 25).  Plaintiff reported fatigue and requested manual therapy because "it always

helps her pain" and that her right-hand issues had been resolved.  (D.E. 10-16, Page 25).

Plaintiff again received physical therapy on November 13, 2018, reporting stiffness upon

arrival.  (D.E. 10-16, Page 23).  Plaintiff reported she needed to leave therapy early and

was noted as having "good relief after manual therapy."  (D.E. 10-16, Pages 23-24).

On November 18, 2018, Plaintiff again received physical therapy at Lavaca Medical Center.  (D.E. 10-16, Page 4).  Plaintiff reported her pain level was eight out of ten, her range of motion was noted as "continuing to improve," and Plaintiff reported "feeling significantly better after treatment today."  (D.E. 10-16, Page 5).  Plaintiff also received physical therapy on November 19, 2018, reporting her pain was eight out of ten but improving with soft tissue massage.  (D.E. 10-16, Page 21).  Plaintiff was noted as "requesting to leave 20 minutes early due to work, shortening treatment time today.  She requested not to skip massage therapy due to 'I feel so much release after it is done.'"  (D.E. 10-16, Page 21).  Plaintiff again received physical therapy on November 28, 2018, reporting that she "has been busy and has not had time to relax or do [home] exercises," and again on November 30, 2018, with Plaintiff reporting that "she is not able to stay long today as she is having to go to work and would prefer to just get the soft tissue massage today."  (D.E. 10-16, Page 15).  Plaintiff reported relief with the soft tissue massage and that she had "not been sleeping well due to things going on at home."  (D.E. 10-16, Page 15).  It is noted that Plaintiff was moving and rotating her cervical spine within normal limits on both sides "despite her complaints of discomfort."  (D.E. 10-16, Page 18).  She again received physical therapy on December 5, 2018, reporting late to her appointment and stating she needed to end the session early "with no reason given" and that "she feels great after she leaves therapy and is 'able to make it through the rest of the day.'"  (D.E. 10-16, Pages 12 and 13).  Plaintiff "strongly requested her soft tissue massage today as she notes it 'really helps' and makes her 'feel better.'"  (D.E. 10-16, Page 13).

Plaintiff again received physical therapy on January 10, 2019[5] at Lavaca Medical Center.  (D.E. 10-16, Page 2).  She reported relief of her back pain "after the performance of the soft tissue massage."  (D.E. 10-16, Page 4).  She was given a free one month membership at the Lavaca Medical Center gym and given pictures of the recommended physical therapy exercises as she had not received approval for additional physical therapy sessions.  (D.E. 10-16, Page 4 and D.E. 10-17, Pages 39-42).  Throughout all of her physical therapy sessions, Plaintiff was continuously noted as alert, calm, being oriented to time, person and place, being cooperative and having the appropriate affect and behavior.  (D.E. 10-16, Pages 2, 4, 11, 19, 22, 25, 26, 29 and 40).

Two weeks later, on January 24, 2019, Plaintiff was treated at Lavaca Medical Center for chest pain.  (D.E. 10-14, Page 30).  Plaintiff reported stress and depression and was crying at times while being treated.  (D.E. 10-15, Pages 36 and 37).  Plaintiff reported her mother was living with her which was stressful and that she takes care of her 11 year old granddaughter.  (D.E. 10-15, Page 36).  Plaintiff also reported she could "connect with spirits," seeing and talking to her deceased brother and grandson at times.  (D.E. 10-15, Page 36).  Plaintiff reported no back, neck, joint or muscle pain and no decreased range of motion.  (D.E. 10-15, Pages 36-37).  She was noted as alert, cooperative and oriented to time, person, place and situation.  (D.E. 10-15, Page 37).  All testing, including an EKG, was normal.  (D.E. 10-15, Page 37).  Noting Plaintiff's history of anxiety, depression and

---

[5]Plaintiff's physical therapy sessions took place beyond the six week window as Plaintiff canceled and rescheduled several sessions for various reasons, including having a bad morning, putting up her Christmas tree and returning from Houston.  (D.E. 10-17, Pages 30-33).

panic attacks, Plaintiff was advised not to blame her chest pain on anxiety but to go to the emergency room if she experienced further chest pain.  (D.E. 10-15, Page 37).  Plaintiff was referred for treatment to an outpatient mental health facility.  (D.E. 10-15, Page 37).

The next week, Plaintiff was again treated at Lavaca Family Health Clinic on January 31, 2019 for chest pain.  (D.E. 10-14, Page 10).  Plaintiff reported she lived with her children and mother.  (D.E. 10-14, Page 16).  Plaintiff was noted as being alert, oriented and in no acute distress as well as being cooperative with the appropriate mood and affect.  (D.E. 10-14, Page 25).  Plaintiff was scheduled for stress and additional testing the following week.  (D.E. 10-14, Pages 20 and 27).  Imaging of Plaintiff's chest on February 4, 2019 was normal with "[n]o radiographic evidence of acute cardiopulmonary process."  (D.E. 10-15, Page 45).  Her heart size was noted as normal, her lungs were noted as clear and there was no effusion, pneumothorax, or acute osseous abnormality.  (D.E. 10-15, Page 45).  An ultrasound of Plaintiff's veins was also normal, showing "normal compressibility with no evidence of thrombus in the visualized venous structures of bilateral lower extremities."  (D.E. 10-15, Page 46).  An echocardiogram and stress test was also normal.  (D.E. 10-16, Pages 54-55 and 10-17, Pages 12 and 67).  An exercise stress test report on February 5, 2019 showed Plaintiff was in no distress, had no shortness of breath and was ambulating normally with a steady gait.  (D.E. 10-17, Page 12).  Plaintiff's thyroid medication was decreased.  (D.E. 10-17, Page 19).  Noting that her bloodwork was normal on February 11, 2019, Plaintiff was prescribed anxiety medication.  (D.E. 10-17, Pages 20-21).

Plaintiff was assessed for mental health counseling at New Horizons Geriatric Counseling Program at Yoakum Community Hospital ("New Horizons") near the end of February 2019.   (D.E. 10-18, Pages 63-74).   Plaintiff reported having worsening depression, anxiety, panic, anger outbursts, throwing things, yelling and having daily severe crying spells.  (D.E. 10-18, Page 63).   She further reported she was raising her granddaughter and had since her birth.  (D.E. 10-18, Page 63).   Plaintiff also reported her mother, her son and her son's girlfriend also lived with her and there was conflict.  (D.E. 10-18, Page 63).  Plaintiff was noted as clean, cooperative, readily engaging, motivated for change and improved mood, fully oriented, calm but somewhat guarded, having clear thought content, fair insight, fair judgment, being alert, having no memory impairments, an adequate fund of knowledge and no suicidal thoughts.  (D.E. 10-18, Page 64).  Plaintiff was enrolled in individual psychotherapy and encouraged to consider group therapy.  (D.E. 10-18, Page 64).

On March 4, 2019, Plaintiff first received mental health counseling at New Horizons.  (D.E. 10-18, Page 62).  Plaintiff was noted as well groomed, smiling, readily engaging and building rapport and trust with her therapist.  (D.E. 10-18, Page 62).  Plaintiff reported her deceased brother and grandmother "present[ed] themselves to her in spirit form many times a day" and she "teaches her child and grandchildren to talk to deceased loved ones, interact/read/speak/see them."  (D.E. 10-18, Page 62).  Plaintiff advised her goal was home ownership but she had poor credit.  (D.E. 10-18, Page 62).

On March 11, 2019, Plaintiff received mental health counseling at New Horizons. (D.E. 10-18, Page 59).  Plaintiff was again noted as well groomed, smiling, readily engaging and building rapport and trust with her therapist.  (D.E. 10-18, Page 59).  Plaintiff read poetry she authored.  (D.E. 10-18, Page 59).  Plaintiff reported "images of [her] deceased brother and grandmother came to her this past week and told her she would see less of them, but they were 'only a dream away.'"  (D.E. 10-18, Page 59).  Plaintiff's therapist noted they discussed Plaintiff's "interpretation of guardian angels."  (D.E. 10-18, Page 59).  Plaintiff was advised she would "greatly benefit" from group therapy.  (D.E. 10-18, Page 59).

At the April 8, 2019 hearing before the ALJ, Plaintiff testified she had been receiving mental health treatment at New Horizons for about one month, once a week and she was looking into getting a service animal to assist with her anxiety.  (D.E. 10-3, Pages 34-35).  Plaintiff further testified she had constant neck pain that feels like a stabbing knife that travels down her spine and arms for which she uses a TENS unit daily.  (D.E. 10-3, Pages 36-38).  Plaintiff also testified she could grasp objects with both hands only and also had lower back pain for which she was prescribed ibuprofen.  (D.E. 10-3, Pages 38-39).  Plaintiff stated she also used numbing gel and essential oils to ease her lower back pain which "helps a lot."  (D.E. 10-3, Pages 39-40).  Plaintiff testified she could stand for only five minutes because of her right knee arthritic pain as well as her lower back pain and she could walk for six minutes until she was out of breath and in pain.  (D.E. 10-3, Pages 40-41).  Plaintiff further testified she could lift no more than ten pounds, used a shower chair

and had grab bars in her bathroom to ensure she would not fall.  (D.E. 10-3, Pages 42-43).

Plaintiff also testified she never smoked and her lung ailments, for which she uses daily

inhalers and a weekly nebulizer, were caused by hairspray.  (D.E. 10-3, Pages 43-44).

Also at the hearing, the VE testified that a person of Plaintiff's age, education and

work experience with PTSD and depression who could perform detailed work but could

only occasionally interact with others could not work as a hairstylist.  (D.E. 10-3, Pages

46-47).   The VE then testified that a person of Plaintiff's age, education and work

experience with PTSD and depression who could follow simple or normal directions with

only occasional interaction with others could perform work as a laundry worker, kitchen

helper or dishwasher, all medium exertional positions.  (D.E. 10-4, Pages 47-48).  Adding

additional restrictions of only short and simple tasks and instructions, maintaining attention

for two hours, making simple work-related decisions, asking simple questions and for

assistance, no interaction with the general public, no teamwork type tasks with coworkers

and only occasional interaction with supervisors, the VE testified the three positions above

would still be available.  (D.E. 10-3, Pages 49-50).

## VI.   THE ALJ'S DECISION

The ALJ determined Plaintiff had not engaged in substantial gainful activity since

August 23, 2016, the application date.  (D.E. 10-3, Page 14).  The ALJ further determined

Plaintiff had the following severe impairments:  hypothyroidism; disorder of the spine;

depression; and anxiety but did not have an impairment or combination of impairments

that meets or medically equals the severity of a listed impairment.  (D.E. 10-3, Pages 14-

15).   The ALJ found Plaintiff had the RFC to perform medium work except that she is able to understand, remember and carry out short and simple tasks and instructions.  (D.E. 10-3, Page 18).   The ALJ further determined Plaintiff could respond to routine work changes; maintain attention on these tasks for two hours at a time; make work related decision; remember tasks; ask simple questions; request assistance; could have limited social interaction but was not precluded as long as there is no contact with the general public, no teamwork tasks performed with coworkers and only occasional interaction with supervisors.  (D.E. 10-3, Page 18).

In making this RFC determination, the ALJ considered Plaintiff's hearing testimony, her function reports and work activity after the application date in addition to medical records and opinions.  (D.E. 10-3, Pages 18-22).   As to her alleged psychologically based symptoms, the ALJ determined they did not compromise her ability to function independently, appropriately, and effectively on a sustained basis, noting Plaintiff "has not had any longitudinal ongoing treatment with a mental health professional, and there is no evidence that she was hospitalized or was seen in the emergency room secondary to mental problems." (D.E. 10-3, Page 20).   Reviewing the consultative examination by Dr. Alvarez-Sanders, the ALJ noted:

> At the consultative examination, she wrote a grammatically correct sentence. Her intelligence was average.  She repeated only two of three orally delivered words immediately after oral presentation, but all three words during the second trial.  She retrieved only two of the three words.  Her remote memory was average.  She was able to follow simple, three step oral directions, as well as simple written directions.  The claimant's concentration was average. She provided concise and detailed responses to requests for information.  Her

abstract reasoning was average.   Her general fund of information was average…

At the consultative examination, the claimant's judgment and insight were average.   She was casually dressed and well groomed.   She maintained eye contact.  Rapport was easily established.   She was responsive and cooperative throughout the examination.   Her speech was normal in speed, tone and volume…

With respect to the psychological consultative examiner's opinion, the undersigned finds that the conclusion from this one-time examination that the claimant has a guarded prognosis even with treatment lacks corroborative support from the medical record.   The claimant has not required intensive mental health treatment during the relevant period.   Further, the consultative examination's report is based heavily on the claimant's subjective complaints, as is common with a one-time psychological consultative examination, but the undersigned finds her subjective complaints to be only partially consistent with the evidence of record.   Because this opinion is inconsistent with the applicable clinical evidence, as well as the claimant's activities of daily living and improvement with treatment, the undersigned gives little weight to this opinion.

(D.E. 10-3, Pages 21-22).

The ALJ also noted "[t]he treatment that the claimant has received has been essentially routine and/or conservative in nature, which is inconsistent with her allegations of disabling symptoms.   The lack of evidence of emergency room records for 'extreme' symptomology suggests that her impairments are well controlled.   She was taking ibuprofen for pain occasionally.   She did not have pain in her neck/shoulder because she used essential oils in the morning.   She uses essential oils often, which help a lot.   The claimant has not alleged any side effects from use of medications.   If an impairment can be controlled by treatment or medication, it cannot be considered disabling."   (D.E. 10-3, Pages 21-22).   The ALJ also noted Plaintiff takes care of her granddaughter, prepares

simple meals, sweeps, does laundry including ironing, mows the yard, walks, goes outside every day, drives, rides in a car, spends time with family, and shops each week, indicating her "actual daily activities reveal a significant greater functional ability than alleged." (D.E. 10-3, Page 19). The ALJ also noted "the record reflects work activity after the application date. Although that work activity did not constitute disqualifying substantial gainful activity, it does indicate that the claimant's daily activities have been somewhat greater than the claimant has generally reported." (D.E. 10-3, Page 19). Accordingly, the ALJ found Plaintiff's impairments could be expected to cause the alleged symptoms but Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms was not entirely consistent with the record, noting there was no documentation of persistent limitations in range of motion, muscle spasm, muscular atrophy or significant neurological deficits and there was alleviation of symptoms by medication. (D.E. 10-3, Pages 19-20).

After determining Plaintiff had no past relevant work, a high school education, and considering Plaintiff's age, education, work experience and RFC as well as giving some weight to the state agency consultants' opinions, the ALJ found Plaintiff could perform medium work as a laundry worker, kitchen helper or dishwasher, citing to the VE's testimony. (D.E. 10-3, Pages 22-23). Accordingly, the ALJ held Plaintiff was not disabled. (D.E. 10-3, Page 24).

## VII.   DISCUSSION

Plaintiff challenges the ALJ's determination of both her mental and physical RFCs. For the reasons stated below, the undersigned recommends Plaintiff's arguments are without merit and that substantial evidence supports the ALJ's decision. While Plaintiff asserts the ALJ erred, the undersigned disagrees and recommends Plaintiff is simply asking this Court to reweigh the evidence, which it is not permitted to do as discussed below.

An individual claiming disability has the burden of proving disability and must prove the inability to engage in any substantial gainful activity. *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citation omitted). "The mere presence of some impairment is not disabling per se. Plaintiff must show that she was so functionally impaired by her [disability] that she was precluded from engaging in any substantial gainful activity." *Id.* (citations omitted). Further, it is the task of the ALJ, not this Court, to weigh the evidence. *Hames*, 707 F.2d at 166; *Holmes v. Colvin*, 555 F. App'x 420, 421 (5th Cir. 2014) (citing *Bowling*, 36 F.3d at 434). "It is not the place of this Court to reweigh the evidence, or try the issue de novo, or substitute its judgment…[i]f supported by substantial evidence, the Secretary's findings are conclusive and must be affirmed." *Id.*

An RFC is an assessment, based on all relevant evidence, of a claimant's ability to do work on a sustained basis in an ordinary work setting despite impairments. 20 C.F.R. § 404.1545(a); *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) ("RFC involves both exertional and non-exertional factors.") RFC refers to the most a claimant is able to do despite physical and mental limitations. 20 C.F.R. § 404.1545(a). The ALJ must consider

all symptoms, including pain, and the extent to which these symptoms can be reasonably accepted as consistent with objective medical evidence and other evidence. The ALJ is not required to incorporate limitations in the RFC that are not supported in the record. *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) ("The ALJ as factfinder has the sole responsibility for weighing the evidence and may choose whichever physician's diagnosis is most supported by the record.") (citation omitted). Here, the ALJ thoroughly summarized and analyzed Plaintiff's conditions, including any subjective complaints and the objective medical evidence, finding Plaintiff had multiple severe impairments, including hypothyroidism, disorder of the spine, depression and anxiety, but no impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (D.E. 10-3, Page 14). After finding Plaintiff had no past relevant work, the ALJ determined Plaintiff had the RFC to perform a modified range of medium work, taking into account Plaintiff's mental and physical impairments. (D.E. 10-3, Pages 18-24).

Plaintiff first alleges the ALJ failed to properly consider the opinion of Dr. Alvarez-Sanders when determining Plaintiff's mental RFC.[6] The ALJ determined Dr. Alvarez-Sanders' "conclusion from this one-time examination that the claimant has a guarded prognosis even with treatment lacks corroborative support from the medical record," noting Plaintiff did not require "intensive mental health treatment during the relevant period," the

---

[6]As Plaintiff filed her claim on August 23, 2016, the new Social Security Administration rule regarding RFC determinations for all claims filed on or after March 27, 2017 does not apply. 20 C.F.R. § 404.1520c. Therefore, the Commissioner was required to give specific evidentiary weight to treating and examining physicians. *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); 20 C.F.R. § 416.927. The factors under 20 C.F.R. § 416.927(c) are:  (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician.

report was based heavily on Plaintiff's subjective complaints and the opinion was inconsistent with the record including Plaintiff's improvement with treatment and activities of daily living.  (D.E. 10-13, Page 22).  Therefore, the ALJ afforded the opinion "little weight."  (D.E. 10-13, Page 22).  Plaintiff asserts it is a "questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." (D.E. 15, Page 12).  Plaintiff further asserts it was "misguided" for the ALJ to find Dr. Alvarez-Sanders' opinion lacked credibility because it was based on one examination. (D.E. 15, Page 12).  Plaintiff then cites to portions of the record where she reported seeing her deceased relatives, asserting this demonstrates she has serious mental health problems which support Dr. Alvarez-Sanders' opinion that she would encounter significant difficult dealing with everyday pressures and stress in a work environment.  (D.E. 15, Pages 13-14).

While Dr. Alvarez-Sanders opined Plaintiff was more limited in certain areas than found by the ALJ, the ALJ is not bound by Dr. Alvarez-Sanders' assessment so long as the ALJ sufficiently explained the weight assigned to the opinion.  *Beck v. Barnhart*, 205 F. App'x 207, 213-14 (5th Cir. 2006); *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007). An ALJ may reject any opinion, in whole or in part, "when the evidence supports a contrary conclusion."  *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995).   This is what occurred here.

While Plaintiff cites to portions of Plaintiff's treatment records where Plaintiff reported she saw and spoke with her deceased relatives, she completely ignores the remainder of the record, as noted by the ALJ, which showed consistently normal mental

examinations throughout 2013 to 2019 where Plaintiff's appearance, mood, affect, intellect, attention, thought processes, memory, concentration, orientation, insight and judgment were normal and/or appropriate and she was described as cooperative and engaging with treating physicians, mental health counselors and physical therapists even when intermittently described as depressed or anxious. (D.E. 10-8, Pages 4-5, 10-13, 17, 19, 28, 31, 39-44; D.E. 10-9, Pages 20, 24, 28, 29, 31; D.E. 10-10, Pages 5, 9, 13, 17, 20, 25, 29, 33-34, 38, 41, 44, 48, 51, 55, 58; D.E. 10-11, Pages 8, 19, 29, 41; D.E. 10-12, Page 22; D.E. 10-19, Pages 7-36; D.E. 10-13, Pages 11, 13, 15, 17, 23, 35, 37-38, 40-41, 42-43, 45; D.E. 10-14, Page 25; D.E. 10-15, Page 37; D.E. 10-16, Pages 2, 4, 11, 19, 22, 25, 26, 29 and 40; and D.E. 10-18, Pages 59, 62, 64). Further, during her consultative examination, Plaintiff was noted as responsive, cooperative, a reliable historian, having clear speech, maintaining eye contact, providing concise and detailed responses which were organized and goal directed and having average intelligence, remote memory, concentration, judgment and insight. (D.E. 10-8, Pages 59-60). Dr. Alvarez-Sanders' also noted Plaintiff had "never experienced an episode of decompensation…[nor had she been] hospitalized for a mental health condition." (D.E. 10-8, Page 58). Additionally, the record shows Plaintiff took care of her minor granddaughter having joint custody during the entire time at issue, could care for animals, drive, shop for several hours, cook, handle money, sew, write poems and songs, watch television, walk and sit outside, visit friends and family and perform household chores, including sweeping, laundry, ironing and mowing the yard. (D.E. 10-7, Pages 16-17 and 31-32; D.E. 10-8, Page 58; D.E. 10-18, Page 63).

The ALJ considered those portions of Dr. Alvarez-Sanders' assessment supported by her examination findings and consistent with the record as a whole. *Garcia v. Colvin*, 622 F. App'x 405, 409 (5th Cir. 2015) (An ALJ may place less weight, little weight, or even no weight on a report if statements are brief or conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence). An ALJ "is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly." *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) (citation omitted). Here, the ALJ discussed the competing evidence in the decision, including the observations and findings of Dr. Alvarez-Sanders, and found her limitations were not supported for the reasons discussed above, including reasoning for discounting Plaintiff's subjective complaints. Therefore, having reviewed the record, the undersigned recommends Plaintiff's first argument is without merit as substantial evidence supports the ALJ's mental RFC determination.

Plaintiff next alleges the ALJ's physical RFC is not supported by substantial evidence in the record, asserting the ALJ did not properly develop the record by failing to order a consultative examination. Therefore, Plaintiff asserts the ALJ simply expressed his own opinion about the Plaintiff's physical limitations when determining Plaintiff's RFC and he is not permitted to do so.

"The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citation omitted). "Generally, however, the duty to obtain

medical records is on the claimant." *Gonzalez v. Barnhart*, 51 F. App'x 484 (5th Cir. 2002)

(The ALJ, who made numerous inquiries regarding Plaintiff's medical condition and

employment history and also inquired as to whether Plaintiff desired to present additional

evidence, did not fail to develop the record by not ordering a consultative examination and

a consultative examination was not necessary to enable the ALJ to make a disability

determination).   The burden of proof lies with the Plaintiff to prove disability under the

first four steps of the five-step inquiry.   *Leggett*, 67 F.3d at 564.   Further, the Fifth Circuit

has held the absence of a medical source statement about a plaintiff's ability to work does

not, by itself, make the record incomplete. *Ripley v. Charter,* 67 F.3d 552, 557 (5th Cir.

1995).   Instead, the issue is whether substantial evidence exists in the record to support the

ALJ's decision.   *Id*.   To be substantial, such evidence must establish the effect claimant's

ailments had on that claimant's ability to work.   *Id*.

The ALJ satisfied the duty to develop the record by thoroughly reviewing the

medical records from Plaintiff's treating physicians regarding any physical limitations, the

VE's testimony, Plaintiff's testimony and function reports as well as the report of a state

agency physician.   The ALJ properly evaluated Plaintiff's impairments and the

completeness of the record before determining Plaintiff's physical RFC.  (D.E. 10-3, Pages

18-22).  In support of her argument, Plaintiff again cites to portions of the record showing

Plaintiff had various physical ailments, ignoring the remainder of the record as discussed

below.

Reviewing the entire record, objective tests were normal or showed no more than mild physical ailments.  On August 7, 2015, a head CT after Plaintiff complained of headaches showed "[n]o acute intracranial CT findings." (D.E. 10-8, Page 14).  On January 12, 2016, radiology reports of Plaintiff's right femur and right hip showed mild degenerative changes with "[n]o other significant bone or joint abnormality" and normal soft tissue after Plaintiff reported right hip and thigh pain after twisting her leg exiting a vehicle.  (D.E. 10-8, Pages 17-22).  An April 13, 2016 carotid doppler ultrasound was normal and showed no significant plaque in Plaintiff's carotid arteries.  (D.E. 10-8, Page 24).  A May 13, 2016 radiology report related to Plaintiff's chest showed no acute disease. (D.E. 10-8, Page 25).  Plaintiff's lungs were clear with no effusion, normal heart size and normal pulmonary vasculature.  (D.E. 10-8, Page 25).  A May 19, 2016 chest x-ray showed "[n]o acute findings in the chest" with clear lungs and a normal size heart without pleural effusion or pneumothorax.  (D.E. 10-12, Pages 3-4).  The same day, spirometry, vital capacity, lung volume and diffusion testing were conducted and findings were normal. (D.E. 10-12, Pages 7 and 10).  An August 13, 2016 EKG was normal and a chest x-ray showed no acute disease with no infiltrates or effusions.  (D.E. 10-18, Pages 30 and 35). After she slipped, X-rays of Plaintiff's left knee on September 8, 2016 were unremarkable, showing no significant bone or joint abnormality, normal soft tissues and well-preserved joint spaces.  (D.E. 10-8, Page 47).  On April 20, 2017, imaging of Plaintiff's lumbar and cervical back were normal, with normal disc spaces, vertebral heights and alignment.  (D.E. 10-8, Pages 53-54).  Imaging of Plaintiff's right-side ribs on June 13, 2017 was

"[u]nremarkable" with "[n]o obvious rib fracture seen" and normal soft tissues.  (D.E. 10-13, Page 57).  On February 20, 2018, imaging of Plaintiff's right foot showed no fracture or other abnormality.  (D.E. 10-13, Page 50).  On January 24, 2019, after Plaintiff complained of chest pain, all testing, including an EKG was normal.  (D.E. 10-15, Page 37).  Imaging of Plaintiff's chest on February 4, 2019 was normal with "[n]o radiographic evidence of acute cardiopulmonary process."  (D.E. 10-15, Page 45).  Her heart size was noted as normal, her lungs were noted as clear and there was no effusion, pneumothorax, or acute osseous abnormality.  (D.E. 10-15, Page 45).  An ultrasound of Plaintiff's veins the same day was also normal, showing "normal compressibility with no evidence of thrombus in the visualized venous structures of bilateral lower extremities."  (D.E. 10-15, Page 46).  Also the same day, an echocardiogram and stress test were also normal.  (D.E. 10-16, Pages 54-55 and 10-17, Pages 12 and 67).

In addition to objective testing consistently showing none or mild ailments as discussed above, Plaintiff is again regularly noted as having a normal range of motion and strength in her extremities and no generalized joint pain, stiffness, weakness or muscle pain from 2014 to 2019.  For example, in January 2014, Plaintiff was noted as having a full range of motion in her extremities and normal range of motion in all joints, reporting no neck or back pain and being able to use stairs, walk heal to toe and arise unassisted "with ease."  (D.E. 10-9, Page 20 and D.E. 10-12, Page 22).  On February 24, 2014, Plaintiff reported no back or neck pain and a full range of motion in all joints.  (D.E. 10-9, Page 31). In August 2014, after lifting a heavy treadmill and reporting chest pain, Plaintiff was noted

as having a normal range of motion in her neck and no sign of tenderness or trauma in her back, hips or extremities with a normal range of motion in all.  (D.E. 10-8, Pages 4-5). While being treated for poison ivy in September 2014, Plaintiff was noted at four separate appointments to have no joint swelling or muscle weakness.  (D.E. 10-11, Page 28).  In August, November and December 2015, Plaintiff was noted to have a normal range of motion in her neck, back and extremities, being able to ascend and descend stairs, arise from a seated position unassisted and walk heal to toe with ease as well as having no back or neck pain, no insomnia, no muscle aches and no fatigue.  (D.E. 10-8, Pages 10-12 and D.E. 10-9, Page 24).  Plaintiff was noted as having a normal range of motion in her feet, ankles, legs and knees with limited right hip range of motion on January 12, 2016 after Plaintiff twisted her leg.  (D.E. 10-8, Page 18).  However, by January 27, 2016, Plaintiff denied having any pain or tenderness and it was noted that she was doing well.  (D.E. 10-9, Page 22).  Further, while being treated from December 9, 2015 through May 31, 2016, Plaintiff, at nine separate appointments, reported having no breathing problems, no chest pain, no muscle aches or joint pain, no decreased mobility, no headaches and no back pain and was consistently noted as having a full range of motion in her extremities and neck. (D.E. 10-19, Pages 7-36).  In August and September 2016, Plaintiff was found to have a normal range of motion in her back, neck and extremities and having no back or hip pain or tenderness.  (D.E. 10-8, Pages 28, 31 and 39-44).  Throughout 2017 and to February 2018, Plaintiff was noted as having normal breath sounds with no respiratory distress and a normal neck.  (D.E. 10-13, Pages 35, 37-38, 41 and 44).  On February 20, 2018, Plaintiff

was found to have a normal range of motion in her back and neck.  (D.E. 10-13, Page 35).

During her physical therapy sessions from October 2018 to January 2019, Plaintiff reported

having neck pain with onset over the last few months, taking "ibuprofen occasionally for

pain."  (D.E. 10-16, Page 7).  Her rehabilitation potential was noted as good and she

reported improvement in her neck and back with physical therapy and massage, reporting

no pain on November 7, 2018 because she used essential oils on her neck and shoulder.

(D.E. 10-16, Page 30).  Further, on November 30, 2018, it was noted that Plaintiff was

moving and rotating her cervical spine within normal limits on both sides "despite her

complaints of discomfort."  (D.E. 10-16, Page 18).  By January 24, 2019, Plaintiff reported

no back, neck, joint or muscle pain and she was found to have no decreased range of motion

and in February 2019, Plaintiff was found to be ambulating with a steady gait and having

no shortness of breath after an exercise stress test.  (D.E. 10-15, Pages 36-37 and D.E. 10-

17, Page 12).

Further, the ALJ considered Plaintiff's testimony regarding her physical limitations

and daily activities in conjunction with the medical evidence in making her RFC

determination.  (D.E. 13-3, Pages 18-19).  However, the ALJ appropriately found

Plaintiff's statements regarding the severity of her limitations were not entirely credible.

The ALJ also appropriately noted Plaintiff's conservative pain treatment, namely ibuprofen

and essential oils, as well as Plaintiff's work activity after the application date did not

suggest disabling conditions.  (D.E. 10-3, Pages 19 and 21-22).  All of Plaintiff's ailments

and resulting limitations are discussed throughout Plaintiff's extensive treatment records.

The ALJ, who questioned the Plaintiff at length and observed her during the hearing, also thoroughly reviewed her treatment records as well as the rest of the record and was not required to order additional and/or clarifying consultative examinations or additional medical testimony in order to make a disability determination in this case.  The ALJ possessed evidence to fully and fairly develop the record, noting the inconsistencies between Plaintiff's testimony and reported limitations and the other records reflecting her physical capabilities.   Therefore, the undersigned recommends substantial evidence supports the ALJ's physical RFC determination.  *Joseph-Jack v. Barnhart*, 80 F. App'x 317, 318 (5th Cir. 2003) ("We also reject [the claimant's] argument that because the record was devoid of [an RFC] assessment by a medical source, the ALJ was not competent to assess her RFC.  It is the ALJ's responsibility to determine a claimant's RFC, and such an assessment is not a medical opinion.")

Further, even if an extended or additional consultative examination was necessary, to obtain a remand for an ALJ's failure to develop the record, Plaintiff must demonstrate she was prejudiced by the deficiencies she alleges. *Brock*, 84 F.3d at 728 (explaining Plaintiff "must show that he could and would have adduced evidence that might have altered the result") (citation omitted); *Gonzalez*, 51 F. App'x at 484 (Even if a consultative examination was necessary, Plaintiff must make a sufficient showing of prejudice which she has not done because she "has failed to present any evidence or argument showing [her ailments] affected her ability to perform her past relevant work.")  Such prejudice "can be established by showing that additional evidence would have been produced if the ALJ had

fully developed the record, and that the additional evidence might have led to a different decision." *Ripley*, 67 F.3d at 557 n. 22 (citing *Kane v. Heckler,* 731 F.2d 1216, 1220 (5th Cir.1984)).

Here, Plaintiff has failed to make a sufficient showing of prejudice and points to no new sufficient evidence that, had the ALJ developed the record further, would have been offered at the hearing and changed the result. The ALJ conducted a review of the entire record, including Plaintiff's own testimony regarding her pain and limitations cited by Plaintiff in her briefing and used this information when determining Plaintiff's RFC. The ALJ did not have a duty to request further or clarifying consultative examinations when the record already contained substantial evidence upon which to make a determination as discussed above.

Even though the record illustrates Plaintiff suffers from several impairments, substantial evidence supports the ALJ's conclusion that Plaintiff's impairments did not prevent her from working. *Hames*, 707 F.2d at 165. ("[T]he test for disability under the Social Security Act is not satisfied merely because Plaintiff cannot work without some pain or discomfort. Plaintiff must show that she is so functionally impaired that she is precluded from engaging in substantial gainful activity.") (citations omitted). "The ALJ must consider subjective evidence of pain, but it is within his discretion to determine that pain's disabling nature. Such determinations are entitled to considerable deference." *Wren v. Sullivan,* 925 F.2d 123, 128 (5th Cir. 1991) ("Disabling pain must be constant, unremitting, and wholly unresponsive to therapeutic treatment.") (citations omitted).

Plaintiff's arguments request the Court to reweigh the evidence, try the issues de novo, or substitute the Court's judgment for that of the Secretary, all of which it cannot do. *Greenspan*, 38 F.3d at 236. Therefore, the undersigned recommends Plaintiff's arguments are without merit.

## VIII.   CONCLUSION

For the reasons above, the undersigned **RECOMMENDS** Plaintiff's Motion for Summary Judgment be **DENIED** (D.E. 14 and D.E. 15), the Commissioner's Motion for Summary Judgment be **GRANTED** (D.E. 16 and D.E. 17) and this case be **DISMISSED**.

Respectfully submitted on April 15, 2022.

Jason B. Libby
United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996) (en banc).